[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-12932

_____

D.C. Docket No. 1:13-cv-02801-MHC

ROBERT HENRY BRUCE,

Petitioner-Appellant,

versus

WARDEN,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 5, 2016)

Before WILLIAM PRYOR, BLACK and PARKER,[*] Circuit Judges:

PER CURIAM:

---

[*] Honorable Barrington D. Parker, Jr., United States Circuit Judge for the Second Circuit, sitting by designation.

We vacate our previous opinion, filed on June 28, 2016, and substitute this revised opinion in its place.

Federal prisoner Robert Bruce (Bruce) appeals from the district court's denial of his habeas corpus petition, brought pursuant to 28 U.S.C. § 2241.  Bruce contends he can establish his actual innocence of two counts of conviction for first-degree murder to prevent communication to law enforcement officials, in violation of 18 U.S.C. § 1512(a)(1), because no federal nexus was proven.  After review of the parties' briefs and with the benefit of oral argument, we vacate and remand because the district court lacked jurisdiction over Bruce's petition.

## I.  BACKGROUND

In December of 1990, Bruce and his accomplices devised a scheme to rob a mussel shell camp in Benton County, Tennessee owned by Danny Vine, a shell buyer they believed to have large amounts of cash on hand.  On January 16, 1991, Bruce and his brothers, Jerry Bruce (Jerry) and Gary Bruce (Gary), purchased multiple gallon cans filled with gasoline from a convenience store.  The Bruces and David Riales then carried out their plan to rob Vine.  Caught in the act of robbery, the Bruces and Riales tied up Vine and his fiancée, Della Thornton, before Gary shot Vine and Thornton in the head at point-blank range. *United States v. Bruce*, 100 F.3d 957 (Table), 1996 WL 640468 at *1 (6th Cir. Nov. 5, 1996).  The perpetrators dumped Vine's and Thornton's bodies inside Vine's home,

2

poured gasoline over the bodies and throughout the house, and set the house on fire. *Id.*

After a two-and-a-half year investigation, the Bruces and Riales were indicted on November 1, 1993 on eight counts: "(1) conspiracy to commit extortion, racketeering, and threats; (2) affecting commerce and movement of commodities by committing robbery by use of extortion and threats; (3) use of a firearm during the commission of a felony; (4) use of explosives to destroy by means of fire; (5) use of fire to commit robbery and murder; (6) and (7) first-degree murder to prevent communication to law enforcement officials; and (8) conspiracy to obstruct justice, commit perjury, and intimidate or threaten witnesses." *Id.*

Local law enforcement had a difficult time solving the murders because people in the small community were afraid of the Bruce family. According to several potential witnesses, the Bruces and their mother engaged in intimidating behavior. Witnesses began to cooperate against the Bruces only after a federal investigation offered federal protection and grand jury secrecy in 1993.

At trial, several witnesses testified regarding their fear of the Bruce family and the Bruce family's control of Benton County. A fellow inmate of Jerry and Gary, James Magrogan, testified that the brothers talked about the murders while incarcerated. According to Magrogan, the brothers made comments that witnesses

3

would be afraid to say anything to authorities because the Bruce family "ran" the county. Ralph Sentell, the owner of the convenience store at which the Bruces bought the gasoline used to burn evidence of their crime, stated he was afraid of the Bruce brothers and did not tell anyone about the gasoline when he was first interviewed because he "knew their capabilities." Patricia Odham testified she overheard the Bruces talk about robbing shell companies. When they initially mentioned robbing another shell company that employed security, Bruce stated there would be no witnesses if you "shot [the guard's] face off." When the police came to interview Odham, she did not tell them what she had heard. She later moved away because she was afraid of the Bruce family, although they never explicitly threatened her. Mike Franklin testified he overheard the robbery plan and moved out of state because he was nervous. After he left, he eventually contacted an agent from the Tennessee Bureau of Investigation.

Carolyn Barnes provided an alibi for an uncharged Bruce brother, J.C. Bruce. When Barnes told the Bruces' mother, Kathleen Bruce (Kathleen), that Barnes had testified before the federal grand jury, Barnes mentioned she thought she was being watched. Kathleen responded that Barnes was being watched by federal authorities to make sure the Bruce family did not get to Barnes and kill her. Barnes felt threatened by these comments. Tammy Rayburn testified that Bruce came to her after the murders and asked her to be his alibi, but she refused. On

4

several occasions thereafter, she saw Kathleen watching her from across the street and was frightened.

After a three-week trial, the jury returned guilty verdicts on all counts against Bruce, Jerry, and Riales.[1] *Bruce*, 1996 WL 640468 at *1. The district court then sentenced Bruce, Jerry, and Riales to life in prison plus a ten-year term to be served consecutively. *Id.* Bruce appealed his convictions and sentences, and the Sixth Circuit affirmed. *Id.*

On March 16, 1998, Bruce filed a motion under 28 U.S.C. § 2255, which the federal district court in Tennessee denied. Bruce appealed the denial, but the Sixth Circuit denied him a certificate of appealability. In 2003 and 2005, Bruce attempted to file successive § 2255 motions, both of which were denied. On May 30, 2013, Bruce filed another motion in federal district court in Tennessee, arguing that his two murder convictions must be overturned in light of *Fowler v. United States*, 563 U.S. 668 (2011). The district court denied the motion, finding it lacked jurisdiction to entertain Bruce's claim.

On August 21, 2013, Bruce filed a § 2241 motion in the Northern District of Georgia, the district in which he is presently incarcerated, and asserted his two murder convictions should be overturned based on *Fowler*. He argued that he was actually innocent of the two witness-tampering murder convictions under 18

---

[1] Gary escaped from pretrial custody and was still a fugitive when the trial began, so his case was severed from the other defendants. *Bruce*, 1996 WL 640468 at *1 n.1.

5

U.S.C. § 1512(a)(1) because the Government relied on the wrong standard of proof.

The magistrate judge issued a Report and Recommendation (R&R) denying Bruce's petition.  The district court adopted the R&R and denied Bruce's § 2241 petition.  Bruce now appeals the denial.

## II.  DISCUSSION

Bruce contends that his petition fits into the savings clause of 28 U.S.C. § 2255(e) because he is actually innocent of his two convictions for first-degree murder to prevent communication to law enforcement officials, in violation of 18 U.S.C. § 1512(a)(1).  Bruce contends the Supreme Court's decision in *Fowler* overturns existing precedent, applies retroactively, and enables him to raise his actual innocence claim.

Under the federal witness tampering statute, it is unlawful to "kill[] or attempt[] to kill another person, with intent to . . . prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense."  18 U.S.C. § 1512(a)(1)(C).  The statute provides that the government is not required to prove state of mind with respect to whether the law enforcement officer is a federal officer.  *Id.* § 1512(g)(2).

6

*Fowler* subsequently clarified the government's burden of proof in a

§ 1512(a)(1)(C) offense.  Under *Fowler*, the government

> must show a *reasonable likelihood* that, had . . . the victim communicated with law enforcement officers, at least one relevant communication would have been made to a federal law enforcement officer.  That is to say, where the defendant kills a person with an intent to prevent communication with law enforcement officers generally, that intent includes an intent to prevent communications with *federal* law enforcement officers only if it is reasonably likely under the circumstances that (in the absence of the killing) at least one of the relevant communications would have been made to a federal officer.

563 U.S. at 677-78.  The government must prove the intent to prevent a

communication based on a reasonable likelihood that, had the victims

communicated with authorities, at least one relevant communication would have

been with a federal officer.  In other words, the government "must show that the

likelihood of communication to a federal officer was more than remote, outlandish,

or simply hypothetical." *Id.* at 678.

Counts 6 and 7 of the indictment charged Bruce with killing Vine and

Thornton with intent to prevent the victims from communicating with a law

enforcement officer and identifying the defendants as the men who robbed them

and burned down Vine's place of business.  The jury was instructed that to convict

Bruce of these counts, the Government had to prove that (1) the defendants killed

someone; (2) with the intent to prevent the communication of information to a law

enforcement officer; and (3) the information related to the commission of a federal

7

offense.  The jury was also instructed to use as federal offenses the crimes of Hobbs Act robbery under 18 U.S.C. § 1951(a) and arson under 18 U.S.C. § 844(i). The stated elements did not explicitly require the jury to find a federal nexus—*i.e* that it was reasonably likely under the circumstances that at least one of the relevant communications would have been to a federal officer.  Although the record is replete with evidence that Bruce's crimes were not solved until a federal investigation began, *see Bousley v. United States*, 523 U.S. 614, 623 (1998) (explaining to establish actual innocence, petitioner must demonstrate that "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him" (quoting *Schlup v. Delo*, 513 U.S. 298, 327-28 (1995)), Bruce contends he is actually innocent of first-degree murder to prevent communication to federal law enforcement officials because no federal nexus was proven.

Before turning to the merits of Bruce's claim, we must first determine the threshold jurisdictional issue of whether the savings clause in 28 U.S.C. § 2255(e) may open the portal to his 28 U.S.C. § 2241 petition.  *Bryant v. Warden, FCC Coleman-Medium*, 738 F.3d 1253, 1262 (11th Cir. 2013).  We review *de novo* whether a prisoner may bring a § 2241 petition under the savings clause of § 2255(e).  *Id.*

A petitioner typically attacks the validity of his federal sentence under § 2255.  *Sawyer v. Holder*, 326 F.3d 1363, 1365 (11th Cir. 2003).  "Under the

8

savings clause of § 2255, a prisoner may file a § 2241 petition if an otherwise

available remedy under § 2255 is inadequate or ineffective to test the legality of his

detention." *Id.*  The savings clause provides:

> An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by [a § 2255 motion], shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

28 U.S.C. § 2255(e).

An actual-innocence claim cannot, by itself, open the gateway to relief under

the savings clause.  *Zelaya v. Sec'y Fla. Dep't of Corr.*, 798 F.3d 1360, 1372 (11th

Cir. 2015).  To proceed under § 2241, a federal prisoner first must show some

procedural defect in § 2255 renders it inadequate to test the legality of the

conviction.  *Id.*

When a prisoner has previously filed a § 2255 motion to vacate, he must

apply for and receive permission from this court before filing a successive § 2255

motion.  28 U.S.C. §§ 2244(b)(3), 2255(h).  The restrictions on successive § 2255

motions do not render that section "inadequate or ineffective" within the meaning

of the savings clause.  *Gilbert v. United States*, 640 F.3d 1293, 1308 (11th Cir.

2011) (en banc).

We addressed the scope of the savings clause in *Wofford v. Scott*, 177 F.3d

1236 (11th Cir. 1999).  In *Wofford*, we determined the savings clause applies to a

9

claim when (1) the petitioner's claim is based on a retroactively applicable Supreme Court decision; (2) the holding of which establishes that the petitioner was convicted of a non-existent offense; and (3) circuit law squarely foreclosed the petitioner from raising the conviction claims at trial, on direct appeal, or in his first § 2255 motion. *Wofford*, 177 F.3d at 1244. Subsequently, we have recognized the *Wofford* test is dicta as applied to challenges to convictions, because the petitioner in *Wofford* sought to challenge his sentence rather than his conviction. *Zelaya*, 798 F.3d at 1370. While acknowledging the *Wofford* test may not be the only way to claim relief under the savings clause, we have continued to look to that test in determining whether a prisoner is entitled to relief under the savings clause. *Id.* at 1371-72; *see also Williams v. Warden, Fed. Bureau of Prisons*, 713 F.3d 1332, 1341-44 (11th Cir. 2013).

Bruce cannot show that § 2255 was inadequate or ineffective to test the legality of his conviction. At the time of Bruce's appeal and § 2255 motion, Sixth Circuit precedent did not foreclose a federal nexus challenge. In 2009, the Sixth Circuit addressed the federal nexus argument in the context of 18 U.S.C. § 1512(b)(3). *United States v. Carson*, 560 F.3d 566, 579-82 (6th Cir. 2009). That statute provides, in relevant part, "[w]hoever knowingly . . . engages in misleading conduct toward another person, with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of

information relating to the commission or possible commission of a Federal

offense," shall be fined, imprisoned, or both.  18 U.S.C. § 1512(b)(3).  In *Carson,*

the defendant specifically argued the government failed to prove the misleading

conduct was committed with the intent to hinder, delay, or prevent communication

of truthful information about the possible federal offense to a federal law

enforcement officer.  *Carson*, 560 F.3d at 580.  In analyzing the defendant's claim,

the Sixth Circuit noted "*this circuit has never considered the issue*, [but] other

courts have examined and rejected similar lack of federal nexus arguments."  *Id.*

(emphasis added).

As the Sixth Circuit did not squarely address the federal nexus requirement

at issue in Bruce's case until 2009, Sixth Circuit precedent did not foreclose Bruce

from raising a claim concerning the federal nexus required either on direct appeal

or in his initial § 2255 motion.  *See Zelaya*, 798 F.3d at 1371; *Wofford*, 177 F.3d at

1244.  Accordingly, Bruce was not "deprived of a 'genuine opportunity'" to

challenge his convictions.  *Zelaya*, 798 F.3d at 1372.  Because Bruce was not

foreclosed from raising this very claim in his direct appeal or initial § 2255 motion,

he cannot show that § 2255 was inadequate or ineffective to test the legality of his

convictions for first-degree murder to prevent communication to law enforcement

officials.  Thus, the district court lacked jurisdiction to consider the merits of

Bruce's petition, and we vacate the district court's order and remand to the district court with instructions to dismiss Bruce's petition.

**VACATED and REMANDED.**